UNITED STATES v. TAYLOR et al. (PORT OF PORT ANGELES et al. Interveners).

District Court, W. D. Washington, N. D. June 28, 1929.

No. 637.

Anthony Savage, U. S. Atty., and Tom De Wolfe, Asst. U. S. Atty., both of Seattle, Wash., for plaintiff.

Winter S. Martin and Arthur Collett, Jr., both of Seattle, Wash., for defendants Taylor, United Fishermen's Packing Co., and S. R. Doremus, and intervener Trolling Vessel Owners' Ass'n.

Lewis & Church, of Port Angeles, Wash., for defendant Taylor and intervener Port of Port Angeles.

610

CUSHMAN, District Judge (after stating the facts as above). Section 2128 et seq. of the Revised Statutes made provision for the licensing of Indian Traders. These statutes have been changed by later laws in certain particulars (19 Stat. 200, § 5 [25 USCA § 261.]; 31 Stat. 1066; 32 Stat. 1009, § 10; Compiled Statutes, § 4127 et seq., 25 USCA § 261 et seq.), yet no contention is made that plaintiff is not entitled to such relief as that prayed to prevent trading without the permission of the Commissioner of Indian Affairs upon the Quillehute Indian Reservation. Light v. United States, 220 U. S. 523, 31 S. Ct. 485, 55 L. Ed. 570.

The question is whether the Quillehute river, at the place in question, is itself within or without the Quillehute Reservation (articles 2 and 6 of the Treaty with the Quinaielt and Quillehute Indians, 12 Stat. 971; 2 Kappler, 719; Executive Order of February 19, 1889, creating the Quillehute Indian Reservation; 1 Kappler, 923). It will not be necessary herein to review all of the matters which have been discussed by counsel.

A defense common to all of the defendants is that the Quillehute river is a navigable meandered stream, and not within the reservation. Unless the latter contention, that the portion of the river where these trading barges are maintained is not within the reservation, has been established, plaintiff is entitled to prevail.

The Quillehute Reservation contains less than 2 square miles and is at the mouth of the Quillehute river, which flows directly into the Pacific Ocean about 35 miles south of Cape Flattery. The river is about 5 miles in length. The distance from its mouth to the head of the tide is 2½ miles. It is not made entirely clear by the evidence how far the river is navigable. Beyond question it is navigable to the mouth of the Dickey river, where a wharf is maintained. The Dickey river, which in the field notes of the survey of 1881–82 is called the Dickedoch'tedar river, enters the Quillehute about a mile above its mouth. The point at which the barges of the defendants are maintained is less than one-half mile from the present river mouth, which is south of the barges.

The reservation was created in 1889, just prior to the admission of Washington as a state. The river mouth was then one-half mile north of where the barges are being maintained. The water where the barges are located was then in the nature of a lagoon,

made so by the stoppage, in 1876, of what was then and is now the present mouth of the river. The evidence concerning this part of the river corroborates, in the main, the report of Thomas W. Symons, captain, Corps of Engineers, made in 1895 to the effect that:

"* * * Below this it gets deeper and in the lower half mile it has a depth of 10 to 15 feet at low tide. * * * The river just before reaching the ocean widens out into a small bay or tidal basin. This, at high tide, is about 800 feet wide and 4,000 feet long. It is separated from the ocean by a low sand tongue. The entrance channel is at the northern end of this sand tongue, and is about 150 feet wide and at the throat is about 10 to 12 feet deep. It opens out into a shallow bay studded with concealed rocks, which are so dangerous as to render the bay practically unnavigable. * * * The river formerly opened out to the south, into what is marked Quillayute Harbor. This harbor is, as far as known, free from dangerous rocks and is pretty well sheltered from the northwest winds of summer."

Lieutenant Shunk, Corps of Engineers, reported in 1894, in part, as follows:

"* * * The river formerly emptied into the lower bay, marked Quillayute Harbor at the point A. It could then be entered by vessels drawing 10 feet, and was visited by schooners in the fur trade. * * * In the spring of 1876 a log jam at the old mouth caused the river to break through the north end of the sand spit into the upper bay. This bay is exposed, and so studded with concealed rocks that vessels are afraid to enter. An Indian named Captain Socks owns a 10-ton sloop, the Dart, which he occasionally takes in and out through a tortuous channel, but no one else will attempt it. The present mouth is 150 feet wide and 10 to 12 feet deep. It is sometimes wider and shallower. The old course of the river, south of the present mouth, is marked by a slough about half a mile long. This has filled up to some extent in its upper part, but there is still a channel 10 feet deep at low tide. Between the lower end of this slough and Quillayute Harbor, there is a low sandy isthmus, about 150 yards wide. The inhabitants wish the river to be returned to its former position."

The evidence shows that, during the time the south mouth was as described by Lieutenant Shunk, a substantial, if not the greater, part of the river-ocean navigation, was accomplished by means of a portage across the sandy isthmus filling the then old mouth. Lieutenant Shunk, in his report, says:

"* * * The old course of the river, south of the present mouth, is marked by a slough about half a mile long. This is filled up to some extent in its upper part, but there is still a channel 10 feet deep at low tide. Between the lower end of this slough and Quillayute Harbor, there is a low sandy isthmus about 150 yards wide."

It is in this southerly or lower portion of the then slough described by Lieutenant Shunk that defendants' barges are maintained, which portion the court finds to have been navigable at all times covered by the evidence.

The "sand spit," referred to by Lieutenant Shunk and by Captain Symons described as a "sand tongue," is about one-half mile long, and forms the west bank of what is now the main river, but was then a slough sealed at the south end by the bar formed in 1876. This "sand spit" or "sand tongue" is not tide land, but upland platted in the survey of 1881, approved by the Surveyor General in 1882, as lots 4 and 5 of section 21, township 28 N., range 15 west W. M.

Defendants' barges are fastened to dolphins in the river near the east shore, immediately in front of the Indian village of La Push, at a point between lot 5 above mentioned, a part of which forms the west bank, and lot 6 of the same section on the east. These lots are expressly mentioned in the Executive Order of February 19, 1889, creating the reservation, and are substantially lots 10 and 11 of the resurvey of 1914 and 1915. It is not contended that the resurvey in any way affects the questions involved in the present suit. Exhibit 8, being also Exhibit A-2, and Exhibit 4 show the original platting. Exhibit 6 shows the platting of the resurvey. The Quillehute river is, at, above and below the place where the barges are maintained, a meandered stream.

The War Department, in 1927, expressed "the assent of the federal government, so far as concerns the public rights of navigation," to the driving, by the defendant United Fishermen's Packing Company, of two dolphins in the mouth of the Quillehute river. It is to these dolphins that this defendant's barge is fastened. The barges of the other defendants are maintained near that of the United Fishermen's Packing Company.

About 200 Indians live on this reservation. While many of them do not live there throughout the year, yet the same would appear to be their chief place of residence. Under a contract with Clallam county, Washington, made in 1921, roads upon the reservation have been improved, presumably at the expense of the taxpayers of the state and county. A county school-teacher has recently taught children, Indian and white, in the

government schoolhouse on the reservation. Slight repairs have been made to this schoolhouse by the county school district officers.

Title to all lands of the reservation is in the United States. The patents or allotment certificates for lots in the village of La Push are under section 10 of the Act of June 25, 1910 (36 Stat. 858 [25 USCA § 351]), an act specifically applicable to the state of Washington. These patents contain the following restriction on alienation: "* * * And subject to the restriction that the lot above described shall not be alienated to persons other than members of the tribe, except on approval of the Secretary of the Interior, as provided by said act."

This reservation is under the supervision of the agent of the Neah Bay Reservation. No white people, other than those concerned with reservation affairs, have been allowed to reside upon the reservation. An Indian policeman paid by the United States, is there maintained. Regulations Revised by the Indian Bureau, 1884, § 577 et seq. The agent and this policeman exercise the authority of a court or courts somewhat in the nature of the Court of Indian Offenses. Id. § 496, et seq. These courts have required those convicted of offenses to work upon the roads and trails of the reservation. A water distribution system, paid for by the United States, is maintained thereon. Staked Indian fishing locations for set nets in that portion of the river in question have been maintained by government authority, to the exclusion of outside persons attempting to there fish under state authority.

The Executive Order of February 19, 1889, made pursuant to articles 2 and 6 of the Treaty of 1855–1856 with the Quinaielt and Quillehute Indians (12 Stat. 971; 2 Kappler, p. 720), is as follows:

"Executive Mansion, February 19, 1889.

"It is hereby ordered that the following described tracts of land situate in Washington Territory, viz.: Lots 3, 4, 5, and 6, section 21; lots 10, 11, and 12, and the southwest quarter of the southwest quarter, section 22; fractional section 27, and lots 1, 2, and 3, section 28—all in township 28 north, of range 15 west, be, and the same are hereby, withdrawn from sale and settlement and set apart for the permanent use and occupation of the Quillehute Indians: Provided, that this withdrawal shall not affect any existing valid rights of any party.

"Grover Cleveland."

The second subsection of section 4 of the Act of February 22, 1889 (25 Stat. 667 —the Washington Enabling Act) provides:

"Second. That the people inhabiting said proposed states do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian Lands shall remain under the absolute jurisdiction and control of the Congress of the United States. * * *"

The question for determination, further narrowed, is not for whom the United States holds the title to the bed of the Quillehute river, at this point, in trust until extinguishment of its title to the reservation. The question is, while such reservation, unextinguished, exists, are such lands, the river and its bed, under "the absolute jurisdiction and control of the Congress of the United States" in so far as the regulation of trading and trading establishments thereon is concerned? This question divides itself into two questions: First, was jurisdiction retained over this portion of the river in the creation of the reservation by the Executive Order? Second, has aught occurred since to end such jurisdiction?

The Enabling Act quoted above made a distinction between "unappropriated public lands" and "lands * * * now held by any Indian or Indian tribes." Lands described as "unappropriated public lands" would not include an Indian reservation (Bardon v. N. P. Railroad Co., 145 U. S. 535, 12 S. Ct. 856, 36 L. Ed. 806; Gibson v. Anderson (C. C. A.) 131 F. 39–42), nor would such description include the bed of a navigable river (Mann v. Tacoma Land Co., 153 U. S. 273–284, 14 S. Ct. 820, 38 L. Ed. 714).

The last-described lands above mentioned, "lands * * * now held by any Indian or Indian tribes," embrace river beds and tide lands. In Shively v. Bowlby, 152 U. S. 1, at page 48, 14 S. Ct. 548, 566 (38 L. Ed. 331), it was said: "* * * We cannot doubt, therefore, that Congress has the power to make grants of lands below high-water mark of navigable waters in any territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several states, or to carry out other public purposes appropriate to the objects for which the United States hold the territory. * * *"

The latter part of the foregoing quotation partly quotes and partly paraphrases article 1, section 8, subsec. 3, of the Constitution, which says, in describing the powers conferred upon Congress: "To regulate commerce with foreign nations,. and among the several states, and with the Indian tribes." Quoting further from Shively v. Bowlby, 152 U. S. 1, at page 58 (14 S. Ct. 548, 569):

"* * * The United States, while they hold the country as a territory, having all the powers both of national and of municipal government, may grant, for appropriate purposes, titles or rights in the soil below high water mark of tide waters. But they have never done so by *general laws;* and, unless in some case of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people, and with the object for which the territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the states, respectively, when organized and admitted into the Union. * * *" (Italics those of this, not the Supreme Court.)

The greater power, that is, to grant, includes the lesser power, to reserve or for a time withhold. Winters v. United States, 207 U. S. 564, 28 S. Ct. 207, 52 L. Ed. 340; United States v. Winans, 198 U. S. 371, 25 S. Ct. 662, 49 L. Ed. 1089; Alaska Pacific Fisheries v. United States, 248 U. S. 78, 39 S. Ct. 40, 63 L. Ed. 138, affirming (C. C. A.) 240 F. 274; United States et al. v. O'Brien et al. (C. C.) 170 F. 508.

In Barney v. Keokuk, 94 U. S. 324 at page 337 (24 L. Ed. 224), the court quoted with approval the following from Haight v. Keokuk, 4 Iowa, 199: "According to the case of McManus v. Carmichael, then, Haight owns the soil to high water only. But here is interposed the argument, that this land is not held under the United States by the usual manner of grants, that is, by patent, after a survey, and described by section, town, and range. This is true; but yet it will not affect the extent of the complainant's right. The grant to the half-breeds was to them as persons and not as a political body. *The political jurisdiction remained in the United States. Had the grant been to them as a political society, it would have been a question of boundary between nations or States, and then the line would have been the medium filum aquæ, as it is now between Iowa and Illinois.* * * * The grant was to them as individuals—as tenants in common—and is to be construed as any other grant or sale to individuals." (Italics those of this, not of that, court.)

It is the rule here recognized that distinguishes the present case from those where the controversy is between individuals or as to private grants. The only pertinent reason for question in the case of Donnelly v. United States, 228 U. S. 243, 33 S. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710; and 228 U. S. 708, 33 S. Ct. 1024, 57 L. Ed. 1035, arose because of the fact that the reservation in that case was created not before, but after, the admission of the state, upon which admission title and jurisdiction, unless relinquished, vested in the state over the stream where the offense was committed, if navigable.

The further question remains of whether national jurisdiction over the river has been lost because of anything occurring since the Executive Order creating the reservation. The fact that the Act of June 2, 1924 (43 Stat. 253), declared all "noncitizen Indians born within the .territorial limits of the United States * * * to be citizens of the United States" does not affect the present question. Hallowell v. United States, 221 U. S. 317, 31 S. Ct. 587, 55 L. Ed. 750.

While the diminutive extent of the reservation and the small number of Indians making it their home, the fact that the river is navigable above as well as through the reservation, and the very substantial commerce aided by the maintenance of defendants' trading barges, may afford reasons for congressional enactment or grounds which should influence the executive in the matter of granting licenses to traders, yet they do not affect the law, which it is the court's duty to determine. The expenditure of money by state agencies improving the navigation of the river, the roads upon the reservation, and the government schoolhouse, and in payment of a teacher teaching therein, does not affect the question involved.

The authority of the United States necessary to the administration of an Indian reservation does not ooze away or become lost in the mesh of estoppels. Cramer v. United States, 261 U. S. 219, 43 S. Ct. 342, 67 L. Ed. 622. A state cannot estop itself, by contract, from the exercise of police power. Sanitary Dist. of Chicago v. United States, 266 U. S. 405, 45 S. Ct. 176, 69 L. Ed. 352. Neither can the United States.

While the police power generally was retained by the States (Prigg v. Pennsylvania, 16 Pet. 539, 10 L. Ed. 1060; New York v. Miln, 11 Pet. 102, 9 L. Ed. 648), article 1, section 8, clause 3, of the Constitution

empowers Congress to regulate commerce with the Indian tribes. This includes the police power in so far as the government of an Indian reservation is concerned, at least to the extent that the same is here involved.

The statutes concerning the government of Indians and Indian country, and numerous decisions of courts upholding such statutes, make it unnecessary to cite authority upon this point.

United States et al. v. Ashton et al. (C. C.) 170 F. 509, appeal dismissed for want of jurisdiction in George Bird et al., Individually and as Trustees, etc., Appellants, v. James M. Ashton et al., 220 U. S. 604, 31 S. Ct. 718, 55 L. Ed. 605, is in no way controlling, if for no other reason because in that case the title to the Puyallup Reservation had "been extinguished by the United States" within the meaning of the Enabling Act. This is not only shown by the decision itself, but also by the earlier decision of the State Supreme Court in the case of State of Washington v. Smokalem, 37 Wash. 91, 79 P. 603. In the latter case it is said in the opinion (by Judge Rudkin) at page 93 of 37 Wash. (79 P. 604):

"* * * To a proper understanding of this question, a brief statement as to the nature of this reservation, and the status of the Indians living thereon, at the time of the homicide, becomes material. In 1883 or 1884 the lands on this reservation were allotted to the Indians in severalty, except a small parcel, which is still retained by the government and used for school purposes. On March 3, 1903, all restrictions against the alienation of these allotted lands by the Indians were removed, and the allotted lands are now held by the Indians by the same tenure, and with the same right of alienation, as are the lands of all other citizens of the state. For at least five years prior to the commission of this offense, the Indians residing on this reservation maintained no tribal relations, had no chiefs or head men, maintained no form of Indian government, and had neither laws nor customs. They had abandoned their tribal relations, so far as lay within their power, and had assumed the habits and customs of the whites among whom they dwell. The reservation is divided into school districts and precincts; some, at least, of the Indian children attend the public schools maintained under the general laws of the state; precinct officers, such as justices of the peace and constables, are elected and perform the duties of their offices, in their respective precincts. The Indians are qualified electors of the state, and all their differences are submitted to the courts of the state for adjudication and decision, having no courts of their own. There is no agency at the reservation, and the federal government assumes no jurisdiction whatever over the Indians, except in the simple matter of maintaining the school above referred to. This, in brief, was the condition of affairs on the reservation at the time of the commission of this offense. Do the Indians residing on this reservation, under such circumstances, come within the purview of the act of Congress above referred to?" (Section 9, Act of March 3, 1885.) "We think not. * * * *"

Act of Congress dated March 3, 1927, c. 299, § 4, 44 Stat. 1347 (25 USCA § 398d), provides: "* * * Changes in the boundaries of reservations created by Executive Order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by act of Congress: Provided, that this shall not apply to temporary withdrawals by the Secretary of the Interior."

It is not necessary to determine whether barges maintained in a roadstead, used in the loading and unloading of vessels, might not be considered solely as aids to navigation. Defendants' barges are maintained, at the place in question, throughout the fishing season, and, while they may be more, are not less than mercantile establishments afloat.

If, as alleged by intervener, Trolling Vessel Owners' Association, the system of permits tends to establish a monopoly, with higher prices for merchandise and lower prices for the products offered, because free competition and trade does not obtain or prevail, yet neither intervener nor defendants have directed the court's attention to any provision in the constitution that would deny to Congress the authority to create such monopoly.

The plaintiff is entitled to the relief asked. Upon settlement of the decree, which will be upon notice, evidence and argument will be heard upon which to base an exact description, by reference to established monuments or permanent landmarks, of the portion of the river from which defendant's trading barges are excluded. The decree will expressly provide that no rights of navigation are by it affected.

The bill of complaint herein, filed July 6, 1928, alleges "* * * that representatives of the plaintiff herein have during the past five summers requested the defendants to cease said operations but they have refused." Owing to the delay in promptly instituting this suit, the fact that the evidence fails to establish that defendants have traded with the Indians of the reservation, the ex-

tent and nature of the interests affected, and the harshness of an injunction effective instanter, and in order to afford the defendants opportunity to apply for licenses as traders upon the reservation, and all reasonable time for securing them, the injunction will become effective January 1, 1930.