**UNITED STATES v. MOORE, Director of Fisheries of Washington, et al.**

No. 554.

District Court, W. D. Washington, S. D.

Sept. 26, 1945.

J. Charles Dennis, U. S. Atty., and Harry Sager, Asst. U. S. Atty., both of Tacoma, Wash., and Kenneth R. L. Simmons, Dist. Counsel, Office of the Solicitor, Department of the Interior, of Billings, Mont., for plaintiff.

Smith Troy, Atty. Gen., of Washington, Harold A. Pebbles, Asst. Atty. Gen., and Max Church, Sp. Asst. Atty. Gen., for defendants.

LEAVY, District Judge.

This is an action by the United States on behalf of the Quillehúte Tribe of Indians, wherein the United States seeks to

662

enjoin Milo Moore, Director of Fisheries of the State of Washington, and John Biggs, Acting Director of Game of the State of Washington, from in any manner interfering with the Quillehute Indians in their use of the waters of the Quillehute River and the tide lands of the Pacific Ocean, where the River and ocean border on the reservation, and, further, to enjoin them from exercising jurisdiction in the region just described.

It is admitted that the aforementioned Milo Moore and John Biggs are being proceeded against as public officials of the State of Washington, and not as private individuals. The contest, therefore, is one between the United States and the State of Washington.

The issue for determination here is the ownership of the Quillehute River bed and the ocean tide lands, where they border this Reservation. If such ownership is actually in the State of Washington, the plaintiff is not entitled to the relief sought, and its action must be dismissed. If such lands were included in the Reservation at the time the proclamation was promulgated creating it, then the plaintiff would be entitled to prevail herein.

By reason of previous litigation which involved the jurisdiction of the Federal Government over the identical area, there is presented a question of law that must first be determined before any consideration can be given to the questions of fact in this case.

The plaintiff in 1929 instituted an action in this court against one W. F. Taylor and others; the State of Washington was not a party to such action, either directly or through any of its public officials. In that action it was alleged that W. F. Taylor was maintaining certain barges fastened to dolphins, which were constructed in the bed of the Quillehute River, where the same is adjacent to the Reservation uplands. The United States Government sought, on behalf of the Quillehute Indians, to establish its jurisdiction and control of the particular area involved. The jurisdictional question here presented is identical with that presented in the Taylor case, infra. The late Judge Cushman, sitting in this court, determined in that proceeding that the bed of the River, where it bordered the Reservation, was intended to be, and was, in fact, a part of the Reservation and under federal jurisdiction, and entered a decree for the plaintiff and against

the defendant, Taylor. United States v. Taylor, 9 Cir., 33 F.2d 608.

An appeal followed, resulting in a reversal, and an express holding by the Circuit Court that the river bed and the tide lands were held in fee by the State of Washington and under its exclusive jurisdiction and control. Taylor v. United States, 9 Cir., 44 F.2d 531.

Certiorari was sought and denied in the Supreme Court of the United States. 283 U.S. 820, 51 S.Ct. 345, 75 L.Ed. 1436. Throughout this opinion I shall refer to the litigation mentioned as being the "Taylor case."

The defendants herein, by the answer on file in this case, affirmatively plead the doctrines of res judicata and stare decisis, and they take the position that the application of either of these doctrines are determinative of the issues raised in this case. The plaintiff insists that neither of these doctrines applies to the issues as made by the pleadings and proof submitted, because in the Taylor case the parties were not the same as here, and that it was decided in the Circuit Court upon an erroneous premise as to the facts.

The navigability of the Quillehute River where it borders the Reservation is admitted. It is also admitted that such River is navigable at least for a distance of some miles above the Indian Reservation.

■ While it is clear that the plaintiff in this case was also plaintiff in the Taylor case, the defendant is an entirely different party, being, in fact, the sovereign State of Washington, and any private rights that might be involved here are only incidental. This litigation is a controversy between the Federal Government, on the one hand, acting as guardian of a duly recognized Indian Tribe, and the individuals named herein as defendants, acting in their official capacity for and on behalf of the State of Washington. When so considered, it is evident that the doctrine of res judicata is without application.

■ The second contention of the defendant that the Taylor case is stare decisis and becomes the law of this case is a more serious one. The principles of law to be given application are identical in the Taylor case and in the instant case. The law of the Taylor case is the law of this case, if there is a sufficient degree of similarity between the facts as asserted in the decision in the Taylor case and the

facts as this Court actually finds them in the instant case.

It is undisputed that the facts as stated by Judge Wilbur in writing the opinion in the Taylor case disclose unequivocally an error as to one of the most material features essential to a determination of that case. This being so, it seems to me that this court must apply the principles of law announced in the Taylor case to the facts as actually established by the proof submitted, then ascertain if a different result would be reached in this case from that which obtained in the Taylor case.

■ This court recognizes its duty to apply the law as announced by the Circuit Court of Appeals for this Circuit. We have here a situation where the law has been given application to an erroneous material fact, and it would therefore seem plain that the only way to avoid a palpable injustice is to apply the law to the facts as actually established by the proof, even though it might result in an inferior court's arriving at a result directly contrary to that of an appellate court. There is no way to avoid an obvious injustice except to apply the law to the facts as they are actually established, rather than as they were erroneously determined to be in the Taylor case. I hold, therefore, that the Taylor case does not establish as binding upon this court the doctrine of stare decisis, since the facts as therein stated are not those found in this case.

The defendants contend that, irrespective of the error of fact as stated in the Taylor opinion, the conclusions reached still control because there are sufficient admitted facts in the opinion to support the conclusion reached by the Circuit Court. A few quotations from the Taylor case clearly indicate that the decision turned upon the question as to whether the State of Washington had vested rights in the tide lands of the Pacific Ocean and the Quillehute River bed where these waters were adjacent to the Indian Reservation. That the court held the State had acquired such rights by reason of its existence prior to the creation of the Reservation, is evidenced by the following language [44 F.2d 535]:

"We are inclined to think that the inferences to be derived from the fact that the Quileute [Quillehute] Indians for whom the reservation was set apart are overcome by the *prior* express grant of the tide lands and navigable waters to the state." (Italics mine)

The court then gave consideration to a decision of the United States Supreme Court, in Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820, Ann. Cas.1913E, 710, and used this language:

"This case *would be determinative* of the case at bar were it not for the fact that the title of the state of Washington to the submerged lands now claimed to belong to the Quileute Indian Reservation was subject to the inchoate rights of the Indians. The decision, however, clearly shows the importance of a consideration of *previously* vested rights of a state in navigable streams, in determining the effect of a *subsequent* order setting apart an Indian reservation. So considered, we hold that the order of President Cleveland of February 19, 1889, under consideration, did not reserve the submerged lands in question for their use." (Italics mine)

The Donnelly case, supra, dealt with the question of jurisdiction over the bed of the Klamath River, where, by prior presidential proclamation, the Hoopa Valley Reservation was established upon "a tract of country one mile in width on each side of the Klamath River." 1 Kappler's, p. 815. It was there held that jurisdiction of the bed of the River was in the United States, and belonged to the Indian Reservation, even though no reference to the bed of the River was made in the Executive Order establishing the Reservation. It is this decision that Judge Wilbur says states the law that "would be determinative" as to the Quillehute Reservation.

It is impossible for me to conceive how language could be more direct and unequivocal than that just quoted from the Taylor case, to indicate that the decision turned on the mistaken assumption that the State of Washington was in existence at the time the Reservation was created, and its rights to the river bed and tide lands had become fixed.

■ The Reservation was created on the 19th day of February, 1889, and whatever rights the Quillehute Tribe of Indians have therein were determined on that day. The Enabling Act, by which the Territory of Washington was permitted to become a state, did not become law until the 22nd day of February, 1889, and the State was not admitted into the Union until November 11, 1889.

It would not be a violent assumption to conclude that President Cleveland sought to meet the nation's responsibilities, as fixed by the earlier treaty with the Quillehutes, before he signed the law enabling the territory of Washington to become a state. The Enabling Act provided that the new state expressly waived all claim to the Indian lands within its boundaries. Sec. 4, Act of February 22, 1889, 25 Stat. 676, the Washington Enabling Act.

In the Taylor case, the court said:

"After all, the question is *one of intent* to be determined from the terms of the instruments under consideration in the light of the surrounding circumstances and the history leading up to the promulgation of the instrument."

An examination of the opinion, however, discloses that the Court did not, in the opinion, review the "surrounding circumstances," nor the "history leading up to the promulgation of the instrument," but turned its decision of the case upon the "previously vested rights of a state," and based it upon the mistaken fact that the creation of the State of Washington was prior to the creation of the Indian Reservation, which resulted in the conclusion that the State had vested rights. This court must consider the facts as made by the proof and determine the rights of the parties based upon such proof.

■ To determine the intent of the President when he promulgated the proclamation creating the Quillehute Reservation, we must go back to the treaty made by the Government with this Tribe of Indians in 1855. It is this document that determines the obligation of the Federal Government to this tribe of Indians. Article I of the Treaty specifically provides that the Quillehute Indians, together with Indians of other tribes, ceded to the United States all prior claim they had to a vast acreage of land on the Olympic Peninsula upon the conditions as set forth in Article II of the Treaty, which are:

·"There shall, however, be reserved, for the use and occupation of the tribes and bands aforesaid, a tract or tracts of land *sufficient for their wants* within the Territory of Washington, to be selected by the President of the United States, * * * and no white man shall be permitted to reside thereon without permission of the tribe and of the superintendent of Indian affairs or Indian agents." (12 Stat. 971—

II Kappler's Indian Laws and Treaties, 719.) (Italics mine)

In order to fulfill this solemn treaty obligation, President Cleveland, thirty-four years later, promulgated an Executive Order as follows:

"Executive Mansion, February 19, 1889.

"It is hereby ordered that the following-described tracts of land situate in Washington Territory, viz.: Lots 3, 4, 5, and 6, section 21; lots 10, 11, and 12, and the southwest quarter of the southwest quarter, section 22; fractional section 27, and lots 1, 2, and 3, section 28—all in township 28 north, of range 15 west, be, and the same are hereby, withdrawn from sale and settlement and set apart for the permanent use and occupation of the Quillehute Indians: Provided, That this withdrawal shall not affect any existing valid rights of any party.

"Grover Cleveland."
(I Kappler's 923).

At the time of the issuance of the Executive Order, one Pullen, a white man, by false and fraudulent representations, had secured a preemption claim to lands upon which the Quillehute Indian village was located; and erected thereon a building, and was forcing the Indians out of their homes. This entry was later canceled on the ground of fraud. Other white men, under the Public Land Laws, had settled on practically all the lands adjacent to those described in the Executive Order. It was to protect legitimate entries that the proviso was written into the Executive Order.

For more than forty years following the creation of the Reservation, there was no real conflict of interests between the Indians and whites, and then in 1929, by reason of the use being made by the whites of the bed of the Quillehute River, the Federal Government began the action which is referred to as the Taylor case. Following the holding of the Circuit Court in that case, the State of Washington challenged, for the first time, the right of the Quillehute Indians to take fish in the waters bordering the uplands of their reservation home, and requiring that they comply with all state game and fish laws. This resulted in reducing their means of a livelihood to the point of starvation. The returns from the sale of fish taken dropped from $20,000 for the year preceding the decision, to $7,000 for the year following.

The action we have here was then instituted by the Government to establish the Indians' claim that they are entitled to the bed of the Quillehute River and the tide lands as included within the boundaries of the Reservation.

At the time the treaty was negotiated with the Indians, and the United States Government agreed to reserve "a tract or tracts of land sufficient for their wants," none of the lands in the region had been surveyed. Such survey was made many years later, about 1881. The proclamation described the reservation by legal subdivision in accordance with this survey, and was entirely silent as to any rights in the bordering waters. The defendants insist that the exterior boundary lines of the Reservation must be accepted as being limited by the legal descriptions of the various subdivisions set forth in the proclamation. The plaintiff insists that the federal government's obligation under the treaty could not be fulfilled except by including in the lands described the tide lands of the ocean and the bed of the river as the same borders thereon. It must be granted that the President, in promulgating his Executive Order, intended to meet the Government's responsibilities as fixed by the earlier treaty.

To determine what the intent of the President was, it is necessary that we examine carefully what was required in the way of a reservation sufficient for the wants of these Indians.

In construing the language in the treaty and that of the Executive Order, a rule of liberal construction must always be applied in favor of the Indians. The leading case announcing this principle, and one which has controlled for more than one hundred years, is the case of Worcester v. Georgia, 6 Pet. 515, 31 U.S. 515, 563, 8 L.Ed. 483. This case was decided in 1832. The opinion was written by the great Chief Justice Marshall, and as is characteristic of all opinions written by that outstanding jurist, it is a masterpiece in legal literature. The principles there announced have never in the scores of cases that have since been decided, involving rights of Indians, been in any way distinguished or modified. This decision was apparently completely overlooked in the decision of the Taylor case. The importance of a proper determination in a controversy between the various Indian tribes and others involving treaty stipulations is evidenced by the fact that Associate Justice John McLean wrote an extended concurring opinion, using this language:

"As this case involves principles of the highest importance, and may lead to consequences which shall have an enduring influence on the institutions of this country; and as there are some points in the case on which I wish to state, distinctly, my opinion, I embrace the privilege of doing so. With the decision just given, I concur."

And then Justice McLean used this significant language:

"The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense. To contend, that the word 'allotted,' in reference to the land guaranteed to the Indians, in certain treaties, indicates a favor conferred, rather than a right acknowledged, would, it would seem to me, do injustice to the understanding of the parties. How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction."

Chief Justice Marshall stated in his opinion on the same case:

"Is it reasonable to suppose, that the Indians, who could not write, and most probably could not read, who certainly were not critical judges of our language, should distinguish the word 'allotted' from the words 'marked out'? * * * To the United States, it could be a matter of no concern, whether their whole territory was devoted to hunting-grounds, or whether an occasional village, and an occasional cornfield, interrupted, and gave some variety to the scene.

\* \* \* \* \*

"By the fifth article, the Cherokees allow the United States a road through their country, and the navigation of the Tennessee river. The acceptance of these cessions is an acknowledgment of the right of the Cherokees to make or withhold them.

\* \* \* \* \*

"From the commencement of our government, congress has passed acts to regulate trade and intercourse with the Indi-

and, which treat them as nations, respect their rights, and manifest a firm purpose to afford that protection which treaties stipulate. * * *

"The very term 'nation,' so generally applied to them (Indians) means 'a people distinct from others.' The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently, admits their rank among those powers who are capable of making treaties."

From the foregoing quotations it is plain that not alone must there be a liberal construction favorable to the Indians applied to the language of the treaty, but the obligation on the part of the Federal Government to carry out the intent of a treaty is a serious and solemn one.

Other cases that throw light upon this matter are Gaines v. Nicholson, 9 How. 356, 365, 50 U.S. 356, 365, 13 L.Ed. 172, wherein the court said:

"No previous grant of Congress could be paramount, according to the rights of occupancy which this government has always conceded to the Indian tribes within her jurisdiction.

"It was so much carved out of the Territory ceded, and remained to the Indian occupant, as he had never parted with it. He holds, strictly speaking, not under the treaty of cession, but under his original title, confirmed by the government in the act of agreeing to the reservation."

And Choctaw Nation v. United States, 119 U.S. 1–28, 7 S.Ct. 75, 90, 30 L.Ed. 306, which is much in point to the issues here involved, wherein it was said by the Supreme Court:

"The recognized relation between the parties to this controversy, therefore, is that between a superior and an inferior, whereby the latter is placed under the care and control of the former, and which, while it authorizes the adoption on the part of the United States of such policy as their own public interests may dictate, recognizes, on the other hand, such an interpretation of their acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection. The parties are not on an equal footing, and that inequality is to be made good by the superior justice which looks only to the substance of the right, without regard to technical rules framed under a system of municipal jurisprudence, formulating the rights and obligations of private persons, equally subject to the same laws."

In United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 664, 49 L.Ed. 1089, involving a treaty made with the Yakima Indians some four years after the treaty here in question, and concerned with the construction to be placed upon the language of the treaty, the court said:

"How the treaty in question was understood may be gathered from the circumstances. * * *

"The treaty was not a grant of rights to the Indians, but a grant of rights from them,—a reservation of those not granted."

Another case dealing directly with the rule of interpretation of agreements and treaties with Indians, Winters v. United States, 207 U.S. 564–576, 28 S.Ct. 207, 211, 52 L.Ed. 340, states the rule to be:

"* * * ambiguities occurring will be resolved from the standpoint of the Indians. And the rule should certainly be applied to determine between two inferences, one of which would support the purpose of the agreement and the other impair or defeat it. On account of their relations to the government, it cannot be supposed that the Indians were alert to exclude by formal words every inference which might militate against or defeat the declared purpose of themselves and the government, even if it could be supposed that they had the intelligence to foresee the 'double sense' which might some time be urged against them. * * *

"The power of the government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be. * * * That the government did reserve them, we have decided, and for a use which would be necessarily continued through years. This was done May 1, 1888, and it would be extreme to believe that within a year Congress destroyed the reservation and took from the Indians the consideration of their grant, leaving them a barren waste,—took from them the means of continuing their old habits, yet did not leave them the power to change to new ones."

For further authority, we may look to Alaska Pacific Fisheries v. United States, 248 U.S. 78–88, 39 S.Ct. 40, 41, 63 L.Ed.

138. This case has many features common to the present controversy. The language particularly applicable is:

"The reservation was not in the nature of a private grant, but simply a setting apart, 'until otherwise provided by law,' of designated public property for a recognized public purpose—that of safe-guarding and advancing a dependent Indian people dwelling within the United States. * * *

"The Indians could not sustain themselves from the use of the upland alone. The use of the adjacent fishing grounds was equally essential. * * *

"This conclusion has support in the general rule that statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians."

In Shoshone Tribe v. United States, 299 U.S. 476–497, 57 S.Ct. 244, 252, 81 L.Ed. 360, referring to the power of the federal government in connection with the creation of Indian reservations and dealing with Indian tribes, it was said:

"The power does not extend so far as to enable the government 'to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation; * * * for that "would not be an exercise of guardianship but an act of confiscation."' * * * The right of the Indians to the occupancy of the lands pledged to them may be one of occupancy only, but it is 'as sacred as that of the United States to the fee.'"

The most recent expression of the Supreme Court is found in United States v. Santa Fe Pacific Railway Co., 314 U.S. 339, on page 353, 62 S.Ct. 248, on page 255, 86 L.Ed. 260, wherein Justice Douglas, writing the opinion of the court stated:

"We find no indication that Congress by creating that reservation intended to extinguish all of the rights which the Walapais had in their ancestral home. That Congress could have effected such an extinguishment is not doubted. But an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards. As stated in Choate v. Trapp, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L. Ed. 941, the rule of construction recognized without exception for over a century has been that 'doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith.'"

And then again in the same decision, 314 U.S. on page 358, 62 S.Ct. on page 257, 86 L.Ed. 260, there is language very applicable to the situation presented in this case:

"The Walapais saw their old domain being preempted. They wanted a reservation while there was still time to get one. That solution had long seemed desirable in view of recurring tensions between the settlers and the Walapais. * * * That would make the creation of the 1883 reservation, as an attempted solution of the violent problems created when two civilizations met in this area, illusory indeed. We must give it the definiteness which the exigencies of that situation seem to demand. Hence, acquiescence in that arrangement must be deemed to have been a relinquishment of tribunal rights in lands outside the reservation and notoriously claimed by others."

In Pioneer Packing Company v. Winslow, 159 Wash. 655, 294 P. 557, the late Justice Main of the Supreme Court of the State of Washington, in a very learned opinion, adopted the rule of liberal construction as indicated by the foregoing decisions.

█ There has been some contention here that since it is admitted that the Quillehute River is a navigable stream, there might be a question as to the power of Congress to make it a part of an Indian Reservation.

The case of Shively v. Bowlby, 152 U.S. 1–48, 14 S.Ct. 548, 566, 38 L.Ed. 331, completely disposes of this contention, as it announces the rule to be:

"* * * Congress has the power to make grants of lands below high-water mark of navigable waters in any territory of the United States, whenever it becomes necessary to do so in order to perform international obligations."

And again on page 58 of the same decision in 152 U.S., on page 569 of 14 S. Ct., 38 L.Ed. 331:

"The United States, while they hold the country as a territory, having all the powers both of national and of municipal government, may grant, for appropriate purposes, titles or rights in the soil below high-water mark of tide waters."

In Donnelly v. United States, 228 U.S. 243–264, 33 S.Ct. 449, 456, 57 L.Ed. 820, Ann.Cas.1913E, 710, it is stated:

"From this it results that whether the river be or be not navigable in fact, the river bed is to be deemed as included within the Extension of the Hoopa Valley Reservation."

To the same effect were Heckman v. Sutter, 9 Cir., 119 F. 83, and United States v. Romaine, 9 Cir., 255 F. 253.

■ It is the contention of the defendants herein that since the state and its subdivisions have spent money in schools, roads, harbor improvements, etc., the Federal Government, appearing on behalf of the Indians, at this late date can not be heard to question the boundary lines of the Indian Reservation. This argument was advanced in the Taylor case before Judge Cushman, and was very effectively answered by him in his written decision, wherein he said [33 F.2d 613]:

"The expenditure of money by state agencies improving the navigation of the river, the roads upon the reservation, and the government schoolhouse, and in payment of a teacher teaching therein, does not affect the question involved.

"The authority of the United States necessary to the administration of an Indian reservation does not ooze away or become lost in the mesh of estoppels."

■ The rights of these Indians were established at the time they became parties to the treaty of 1855. They became fixed by the promulgation of the presidential proclamation of February 19, 1889, and anything that has occurred from that date on could in no way modify or alter those rights.

■ Coming now to a brief resume of the evidence submitted in this case, which was largely documentary, and from which we find established beyond a shadow of a doubt that the only means of livelihood that the Quillehute Indians had throughout their entire existence was that obtained almost exclusively from the aquatic life found in the nearby waters. They were and are a fish-eating tribe of Indians, as is abundantly established by the numerous documents which have been submitted in evidence, and the oral testimony that was offered by the oldest members of the tribe.

The uplands described in the presidential proclamation consist of 594 acres, upon which is located the ancient Indian village that has always been the home of this tribe of Indians. The land itself has no value as timber land, and almost none as agricultural land. It is, more or less, a barren waste, and the only value that it could have is as a place where the Indians might live and have free and easy access to the waters adjoining it.

The court, with the consent of counsel representing the respective parties herein, made a personal trip to view the lands included in the reservation and the country surrounding them, in order to have a better understanding of the situation.

The record in this case discloses through documentary evidence that during the time between the making of the treaty and the promulgation of the executive order, the Commissioner of Indian Affairs and his representatives never permitted a year to pass but that they urged upon their superiors that action be taken to create a reservation for these Indians. An abortive effort was made to establish them on the Quinaielt Reservation, which was created by presidential proclamation by President U. S. Grant. They declined to accept this as a reservation, even though some of them did take allotments on the Quinaielt Reservation. Their reason for not accepting the government's offer to go upon the Quinaielt Reservation was that the Quinaielts and Quillehutes for hundreds of years had been enemies, and the Quinaielts did not welcome them. An effort was then made to remove them from their village at the mouth of the Quillehute River to the Makah Indian Reservation, some forty miles to the north, and this again they refused, for the reason that their interpretation of the treaty was that they were to be given a reservation where they had always lived at the mouth of the Quillehute River. Exhibit 13 in this record deals with a conference held at the Quillehute village, wherein a Captain Charles Willowby, the Indian Agent, under whose jurisdiction these Indians were at the time, on August 21, 1879, agreed with them:

"I will write to Washington and recommend that lands be reserved for you as was promised you by Col. Simmons. I want you to continue your fisheries of salmon and seals and whales, as usual."

This promise, made ten years before the presidential proclamation creating the reservation, was made in response to the statements of two old Indian Chiefs, Howeattl and Tahahowtl, who were signatories

to the treaty itself. Howeattl, according to the record, told Captain Willowby:

"Col. Simmons told us when he gave us our papers (referring to the Treaty) that we were always to live on our own land, and that we were not to be removed to another place."

The Indian Chief Tahahowtl said:

"I told Mr. Simmons that my land was from the Island of Upkowis opposite Kwediatsatsit down the coast to the Hooh River. This was my land formerly, and we would not sell our right to the river where we got our salmon into the land at the mouth of the river where we live. We always wish to live where we are. We also claim the right to the sea coast as far as our land extends. And we want onehalf of the prairie land where the cammas grows. The rest we will sell to Washington. Mr. Simmons said it was good, and he wanted to do as the Indians wished. Mr. Simmons said I have not bought your land."

It was when Captain Willowby was advised by these Indian Chiefs as above stated that he wrote his superiors in Washington.

It is in this simple, direct, concise and almost child-like language that we have an authentic report of what took place when the Indian Treaty was negotiated in 1855. We must presume that President Cleveland, in promulgating the order creating the reservation, did so with an intent to carry out the provisions of the treaty. This is more conclusively established when we note that the proclamation itself was drafted by the Indian Service, who, for thirty-five years, had been endeavoring to secure for this tribe of Indians a reservation "sufficient for their wants," and who, as evidenced by the numerous documents in this record, repeatedly called to the attention of the Commissioner of Indian Affairs and the Secretary of the Interior that these Indians were "fish eating Indians" and their sole means of subsistence depended upon a continued use of the waters from which they caught their fish.

The record further discloses that the executive order, together with the descriptions of the lands therein, was submitted after approval by the Secretary of the Interior, to the President, together with various communications and documents disclosing the historical background, on the 18th day of February, 1889, and on the very next day, February 19, 1889, it was promulgated by the President as submitted to him.

It is unfortunate that more than ninety years have elapsed since the treaty was made, and the respective rights of the Indians and the whites have not been definitely adjudicated. I am sure that if the error which appears in the Taylor case had not occurred, that decision would have concluded this matter, and it would have been a decision favorable to the contentions there made by the Indians. To hold, from the historical background, as disclosed by the record in this case, that it was not intended that the Indians should have the lands under the waters here in question would be to conclude that the United States Government had completely repudiated its solemn pledges and promises carried in the treaty with this Indian tribe, and would be in direct conflict with the rule or decision as announced in the remarkable case of Worcester v. Georgia, supra, which has been the authority for dealing with Indian tribes and interpreting Indian treaties from almost the beginning of our national existence.

█ I find that the river bed of the Quillehute River and the tide lands of the Pacific Ocean, where the same border upon and are adjacent to the uplands described in the Executive Order of February 19, 1889, are a part of the Quillehute Indian Reservation, as established by said Executive Order. It follows, therefore, that the relief sought by the plaintiff herein will be granted.

Findings of fact and conclusions of law and decree will be submitted on notice.