**MOORE, Director of Fisheries, State of Washington, et al. v. UNITED STATES.**

No. 11281.

Circuit Court of Appeals, Ninth Circuit.

Oct. 25, 1946.

Smith Troy, Atty. Gen., Harold A. Pebbles, Chief Asst. Atty. Gen., and Max Church, Sp. Asst. Atty. Gen., of Washington, for appellants.

David L. Bazelon, Asst. Atty. Gen., J. Charles Dennis, U. S. Atty., of Seattle, Wash., Roger P. Marquis and John C. Harrington, Attys., Dept. of Justice, of Washington, D. C., for appellee.

Kenneth R. L. Simmons, of Billings, Mont., as amicus curiae and attorney for Quillayute Tribe of Indians.

Before DENMAN, BONE and ORR, Circuit Judges.

DENMAN, Circuit Judge.

Appellants, officers of the State of Washington, appeal from decree, which after determining the boundaries of the Quillayute Indian Reservation, orders "That the said defendants [appellants] and each of them and all persons claiming through or under them are hereby permanently enjoined, restrained, and debarred from interfering in any manner with or asserting any jurisdiction or control whatsoever over fishing activities of members of the Quillehute Tribe of Indians in the Quillehute River, and the tidal waters thereof, as it flows through, borders upon, or touches the lands of the Quillehute Indian Reservation, or in the tidal waters of the Pacific Ocean, as said ocean borders upon and touches said reservation as set aside and described in the Executive Order of February 19, 1889."

The Quillayute River flows through the western Olympic Peninsula into the open Pacific Ocean about 40 miles southerly from the Straits of Juan de Fuca. The portion of the river lying within the lands of the Quillayute Indian Reservation flows almost due southerly for about a mile to the river's mouth, through an estuary having a tidal movement far above the lands in question. The Quillayute town, now called La Push, lies on the easterly side of its mouth. For this distance the westerly boundary of the river is a narrow barren sandspit between the river and the Pacific Ocean,[1] having near its southern terminal at the river's mouth a rocky island useless for any purpose but for fishing or hunting between low and high tide of sea lions seeking the fish entering the river.

Lot 2 and the westerly portion of Lot 1 in Section 28 of the reserved lands cover the bed of the river mouth, at which the estuary narrows to about 500 feet wide, and extend each side along the ocean beaches. That is to say, under the admitted facts, an area of several acres of the river bed at its mouth is in the reservation and beyond the control of the fishing regulations of the State of Washington. Pioneer Packing Co. v. Winslow, 159 Wash. 655, 662, 294 P. 557.

The barren sandspit and rocky island forming the westerly boundary of the river are a part of the reservation. On the opposite side of the river and continuously extending northerly from the lots at the

---

[1] The river is known to have crossed the sandspit and flowed into the ocean at points further north. There is a survey of 1881 showing the discharge at one point and another in 1912 showing it at another place. There is no survey showing the mouth in 1889. In this condition of the record, photographs were introduced showing the present condition of the river and it is stipulated that the river as it now flows shall be deemed so to have flowed at the time of the withdrawal of the reservation lands in 1889. The brief of appellants insists that the case must be disposed of on this stipulation and we agree.

river's mouth and on the river's easterly side are the westerly boundaries of other irregular lots of the reservation contouring on the estuary's shore. The remaining reservation consists of about 500 acres of poor land covered with trees, valued at $5 per acre. It was not suited for agriculture, in which the Indians had no experience.

The situation thus is that several acres of the river's bed at its mouth and the adjoining ocean beach lands have always been in the reservation and from there northerly for a mile the river is enclosed on both sides by the reservation.

The question is: Whether in creating the reservation the United States reserved only the bed of the river at its mouth and the adjoining ocean beach lands, or did it reserve the river's bed for the remaining area within the upland of the reservation, and the Pacific tidal waters on the ocean side of the barren sandspit?

The reservation was made pursuant to a treaty made in 1855, July 1, 12 Stat. 971, with the Quillayute and other Indian Tribes whereby the Indians, for a consideration of $25,000.00 payable in annual installments to all of them, relinquished to the United States all their claims to the vast area in the Territory of Washington. In return the United States agreed to reserve for them in the Territory of Washington a tract of land "sufficient for their wants" and "set apart for their exclusive use" upon which "no white man shall be permitted to reside * * * without permission of the tribe and of the superintendent of Indian affairs or Indian agent."

■ In construing the sufficiency of the Presidential reservation as complying with the treaty provisions for a reservation "sufficient for their wants," that language is "to be liberally construed, doubtful expressions being resolved in favor of the Indians." Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138.

We consider the principles recognized in the Alaska Pacific Fisheries case as controlling here. There, in determining the purposes of the reservation of the Annette Islands with reference to the sufficiency of the wants of the Metlakahtla Indian Tribe,

the primary purpose was stated to be to aid the Indians who were "largely fishermen and hunters accustomed to live from the returns of those vocations, and looked upon the islands as a suitable location for their colony, because the fishery adjacent to the shore would afford a primary means of subsistence and *a promising opportunity for industrial and commercial development.*" (Emphasis supplied.) Alaska Pacific Fisheries v. United States, supra, 248 U.S. 88, 39 S.Ct. 41.

We know of no Indian tribe in which the native skills in hunting and fishing were more highly developed into the so-called "American way of life" in industry and commerce, than in the Quillayutes in the brief period from their contact with the white man at the time of their treaty in 1855 and the making of their reservation in 1889. It conveys a wrong impression to stress, as does the government's brief, the mere fact that they were "fish eating" Indians. The fact is that by 1889 the Quillayutes had a small whaling enterprise, a fur seal skin industry, comparable, save in size, with that of the holders of the fur seal license for the Pribilof Islands, and a salmon seining industry with a commerce in the raw and smoked fish.

The Quillayute Tribe, once of five or six hundred, was reduced to about two hundred men, women and children at the time preceding the reservation. From time immemorial their home was the village at the mouth of the Quillayute River. When first visited by white men, a mound of shells showed that part of their diet was made up of the clams dug at the receding tides of the ocean beach of the sandspit and adjacent waters. They were then catching and smoking salmon, of which there was some commerce with other Indian people. A part of their food was the meat of the sea-going mammals, whales, the sea lions and the pelagic seals moving in the Pacific to and from the Pribilofs. Unlike the Eskimos, with their closed-in decked kayaks, they hunted these mammals in the rough waters of the Pacific in open canoes. Obviously they had been an aboriginal seafaring people of great daring and skill in seeking their meat food and skins for their clothing. After their contact with the

white people that daring and skill continued in the development of their industry and commerce.

*The Quillayute's fur seal industry.* The pelagic fur bearing seal herd, after mating on the Pribilofs, moves south along the 100 fathom line off the western coast of North America, passing by the State of Washington. The herd was threatened with extinction by hunters whose vessels followed its migrations. In 1894, within five years of the reservation of the Quillayute lands, a statute was enacted regulating such sealing. From such regulation were excepted Indians "dwelling on the coast of the United States", who carry on pelagic sealing "in canoes or undecked boats propelled wholly by paddles, oars, or sails, and not transported by or used in connection with other vessels, or manned by more than five persons each, in the manner heretofore practiced by the said Indians. * * *" Act April 6, 1894, c. 57, 28 Stat. 52.

The Congress thus recognized and approved a long established practice of these Indians. The evidence shows that they brought their canoes and the carcasses of the seals to the ocean beach of the sandspit. Thereafter the seals were skinned and their hides treated and thereafter sold to the fur traders. In one season their catch and that of the adjoining Makah Tribe was valued at $20,000. Undoubtedly this sealing income was the source of the capital investment of the Quillayutes in the five sealing and whaling schooners owned by members of the tribe.

*The Quillayute whaling enterprise.* The five schooners of the Indians, manned by them, represent a capital undertaking then unusual in Indian tribes. The evidence shows a take of nine whales in but part of the season of 1888. The flesh of the whales was taken for food. No doubt the carcasses of the whales were taken to the shores of the ocean sandspit.

*The Quillayute salmon catch, curing and commerce.* What has been said about the sealing and whaling concerns the Indians' commercial use of the ocean side sandspit. It is an obvious inference that the Indians, capable of adopting the white man's whaling schooners, would seine salmon. On the other side of the sandspit in the mile long estuary, the Indians spread their salmon nets from its sides and drawing their nets around the running schools pulled them into the estuary's shores. The raw salmon and the smoked product were sold by the Indians to customers as far away as in the Puget Sound cities on the other side of the Olympic Peninsula—a trade well established before the reservation was made. What was not so sold was added to the meat of the ocean mammals for their diet.

The above circumstances are stated in the report of those in charge of the Quillayutes to the Secretary of the Interior, who recommended to the President the reservation of the mile long sandspit and the other lands covering the mouth of the river and extending on the east side of its estuary. It was of similar circumstances concerning the reservation of the navigable waters adjacent to the Annette Islands that the Supreme Court, at page 89 of 248 U.S., at page 42 of 39 S.Ct. of the Alaska Pacific Fisheries case, supra, said: "The circumstances which we have recited shed much light on what Congress intended by 'the body of lands known as Annette Islands.' The Indians could not sustain themselves from the use of the upland alone. The use of the adjacent fishing grounds was equally essential. Without this the colony could not prosper in that location. The Indians naturally looked on the fishing grounds as part of the islands and proceeded on that theory in soliciting the reservation. They had done much for themselves and were striving to do more. Evidently Congress intended to conform its action to their situation and needs * * *."

It is the consideration of such circumstances which determines the government's intent in making a reservation, whether by a Congressional Act as in the Alaska Fisheries case or a departmental reservation as in our decision in United States v. Walker River Irrigation District, 9 Cir., 104 F.2d 334, 335.

We think President Cleveland, for the protection and expansion of their established industries, intended and did reserve to these Indians the sandspit, including its tidal lands, and the bed and waters of the Quillayute River, not only by the ex-

press reservation of its mouth, but also for the mile upwards from its mouth enclosed by the reservation lands, and that this area is not one to which apply the fish and game laws of the State of Washington. Cf. Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820, Ann.Cas.1913E, 710; Heckman v. Sutter, 9 Cir., 119 F. 83, 89; United States v. Romaine, 9 Cir., 255 F. 253, 259.

█ Appellants contend that because in 1910, over 20 years after the reservation was made, certain members of the Quilla-yute Tribe received allotments of land in another reservation, the Quinaielt, we must assume that the President in 1889 did not intend to reserve the tide lands and river waters in the 500 acres occupied by the two hundred persons of the Quillayute Tribe. The ·Quinaielt reservation was made to in-clude the Quillayute Indians, but it was created in 1873. The 1855 treaty with the Quillayutes provided that tribe "agree to remove to and settle upon the same within one year after the ratification of this treaty, or sooner if the means are fur-nished them." At this. later date, 18 years after the time for removal, the Quillayutes declined to move away from their ancestral home and immemorially established mari-time industries on the Quillayute River.[2] The government acquiesced and they re-mained in La Push. We are unable to see any relevance of the 1910 allotments in de-termining the intent of the President in the reservation of 1889.

██ Appellants contend that our deci-sion in Taylor v. United States, 9 Cir., 44 F.2d 531, holding the ´tidal waters of the Quillayute River are not in the reservation, is binding in this proceeding. We agree with the appellee that that case is neither res judicata of the issues here nor is it to be followed as stare decisis. As to res judi-cata, the present parties are not the same,

the defendant in the former case being the owner of barges whom the United States sought to have kept from using the waters of the reservation.

As to stare decisis, this court made a controlling error in political history. It based its opinion upon a statement that Washington entered the Union *before* the reservation was made.[3] As a result of this error our Taylor opinion states, at pages 534, 535, " * * * If we recognize the rule that in grants to Indians uncertainties are to be determined more favorably to them than to the government, we must here recognize that the governmental act is dual in its effect, if so construed, as it takes from the state. a right already expressly granted to it and reserves it for a political body, not by express grant or reservation, but by mere implication. In other words, so construed, the act of the President ex-tends to a political body, merely because it is a political body, a right which must be taken from another political body to which it has been already expressly granted. It would seem more reasonable that the pre-vious express grant to a political body would take precedence *over the implications which would otherwise arise* from the reservation of the upland for an Indian tribe. We are inclined to think that *the inferences to be derived from the fact that the Quileute Indians for whom the reserva-tion was set apart* are overcome by the prior express grant of the tidelands and navigable waters to the state." (Emphasis supplied.) To such a decision, based upon such an error of fact judicially to be noticed, the doctrine of stare decisis cannot apply. We have considered "the inferences to be derived from the fact that the Quileute [Quillayute] Indians for whom the reser-vation was set apart" in view of the fact that the state was admitted to the Union *after* the land was set apart to the Indians, and have come to the above conclusion.

---

[2] The British poet, Kipling, in "The Last Chantey" of his ballads of "The Seven Seas," has sung of another mari-time people whose souls were translated to a sealess heaven,

"Loud sang the souls of the jolly, jolly mariners,
Crying: 'Under Heaven, here is neither lead nor lea!

Must we sing for evermore
On the windless, glassy floor?
Take back your golden fiddles and we'll beat to open sea!'"

[3] The date of the reservation is Feb-ruary 19, 1889, and the Enabling Act for entry into the Union was February 22, 1889, and the state was not admitted until November 11, 1889.

Appellants rely on United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 200, 70 L.Ed. 465, where navigable Mud Lake of 5,000 acres, in a large reservation of 400 square miles, also including Red Lake and a part of the Lake of the Woods, was held "not intended to effect such a disposal" as making the lands under it a part of the reservation. There, as in the Annette Islands case and the instant appeal, the question was one of intent. Alaska Pacific Fisheries v. United States, supra, is not mentioned and we cannot regard it as overruled sub silentio. In the Holt State Bank case there is no evidence of the use of the navigable waters with reference to established industries of the Indians, as in the Annette Island and instant case, which were operated in part on a portion of the river inside the lands reserved, with the uselessness of the sandspit save to enclose the river and to facilitate fishing therein.

If the Circuit Court decision of United States v. Ashton, 170 F. 509, also relied upon by appellants, contains language contrary to the above it is not in accord with our views. United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089, also relied upon by appellants, is a case where the fishing territory was not in a reservation. Shively v. Bowlby, 152 U.S. 1, 14 S. Ct. 548, 38 L.Ed. 331, concerns only a donation grant to an American citizen of lands on the Oregon side of the Columbia River. Its holding that the title ran only to the high water mark has no relevance to the title to tide lands enclosed by an Indian reservation made before the entry of the state into the Union.

Appellants further contend that because the estuary is navigable water, the Washington fish and game laws apply. The fact that navigable waters are a part of a reservation held in trust for the Indian fisheries does not conflict with the trust also to hold them for the public for navigation. Here the issue is confined to the right of control of fishing by the State of Washington which, being in the Indians, that state has held is not in its control. Pioneer Packing Co. v. Winslow, supra.

Appellants also contend that the provision of Article III of the treaty that "The right of taking fish at all usual and accustomed grounds and stations is secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing the same," made the waters within the reservation open to the white man in common with the Indian and hence the Washington regulations apply to both. We do not agree that the above quoted provision gives to the white people access to the reservation waters. It refers generally to a common right of fishing on all the lands ceded by the treaty "not in the actual claim and occupation of citizens of the United States," as stated in the preceding paragraph of the treaty. The right of white persons is not here in question, but if it were and it were held they had the right to fish in the reserved waters, that does not give appellants the right there to enforce the state regulations against the Indians.

What has been said refers to the lands bounded on the west by the sandspit. After the northerly mile of the river from its mouth, it turns easterly and southeasterly. At this turn on the westerly bank, the lands are still in the government. On the southerly bank at the easterly turn and then to the southeasterly, the lands are in the reservation. On the northerly and northeasterly side, the lands are granted to private non-Indian owners. These granted lands are up to the high water mark of the river and do not include the tide lands. Shively v. Bowlby, supra.

The District Court held the river between the high water mark on the northerly bank and the opposite reservation lands is a continuation in the river of the reservation of the mile to the northerly of the river's mouth. Under the rule of liberal interpretation of the treaty's provision and the terms of the reservation to provide for the treaty's requirement of an area for the Indians "sufficient for their wants," we agree with the District Court's decision.

The decree is affirmed.