The **MENOMINEE TRIBE OF INDIANS,** suing on its own behalf and as the representative of its members, or their successors, as a class; and Menominee Enterprises, Inc., suing on its own behalf and as the representative of its stockholders, or their successors, as a class; and Gordon Dickie, James Frechette, Jerry Grignon, and George Kenote, each suing on his own behalf and as the representative of the members of the Menominee Tribe of Indians, or their successors, as a class, and as the representative of the stockholders of Menominee Enterprises, Inc., or their successors, as a class; and First Wisconsin Trust Company, suing as trustee on behalf of all the beneficiaries, or their successors, of the Menominee Assistance Trust Established Pursuant to the Menominee Termination Act of 1954, 25 U.S.C. §§ 891–902

v.

The **UNITED STATES.**

No. 339–65.

United States Court of Claims.

April 14, 1967.

Charles A. Hobbs, Washington, D. C., attorney of record for plaintiffs. Wilkinson, Cragun & Barker and Angelo A. Iadarola, Washington, D. C., of counsel.

Ralph A. Barney, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

SKELTON, Judge.

The Menominee Tribe of Indians, suing on its own behalf and as the representative of its members, or their successors, as a class; and Menominee Enterprises, Inc., suing on its own behalf and as the representative of its stockholders, or their successors, as a class; and Gordon Dickie, James Frechette, Jerry Grignon, and George Kenote, each suing on his own behalf and as the representative of the members of the Menominee Tribe of Indians, or their successors, as a class, and as the representative of the stockholders of Menominee Enterprises, Inc., or their successors, as a class; and First Wisconsin Trust Company, suing as trustee on behalf of all the beneficiaries, or their successors, of the Menominee Assistance Trust established pursuant to the Menominee Termination Act of 1954, 68 Stat. 250, as amended, 25 U.S.C. §§ 891–902 (1964), have filed this suit to collect damages from the Government for the alleged loss of hunting and fishing rights on their reservation in Wisconsin which they claim were abrogated and cancelled by the Menominee Termination Act of 1954, supra, passed by the Congress of the United States. They assert that this Act enabled the State of Wisconsin to impose its hunting, fishing, and conservation laws upon the members of the tribe living on the reservation and this has extinguished their right to hunt and fish on their land "untrammeled by any state law or regulation"; that this is a valuable property right and the Government should compensate them for its loss. They admit they have the right to hunt and fish on the reservation on the same basis as exists for any non-Indian landowner on his land, but they claim the right to be free of any state hunting and fishing laws. They say they should recover damages for the loss of this freedom.

 The Government has challenged the jurisdiction of this court and contends that the Menominee Termination Act, supra, abolished the Menominee Tribe of Indians and that the plaintiffs are not entitled to maintain this suit in this court. We do not agree. It is clear from the wording of the various sections of the Termination Act itself that it was contemplated the Menominee tribe would continue in existence after the Act became effective. For instance, the Act provided procedure for setting up a final roll of the members of the *tribe* and after the roll was completed, certificates were to be issued by the *tribe* to the members whose names appeared on the roll. Furthermore, the interest was to be alienable only in accordance with such regulations as may be adopted by the *tribe*. It provides further, that the Secretary of the Interior would transfer all tribal property to a trustee "for the benefit of the Menominee tribe." Finally, the Act states that after it becomes effective, the individual members of the *tribe* shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians and all statutes of the United States applicable to Indians because of their status as Indians shall no longer be applicable to the members of the *tribe* and the laws of the several states shall apply to the *tribe* and its members and that nothing in the Act shall affect the status of the members of the *tribe* as citizens of the United States. The Termination Act did not abolish the *tribe* or its membership. It merely terminated Federal supervision over and responsibility for the property and members of the tribe. The Menominee Indians continue to constitute a tribe whose membership is composed of those persons whose

names appear on the official roll of the tribe prepared in accordance with the terms of the Termination Act. The tribe continues to hold the beneficial and equitable interest in the property that was conveyed by the Secretary of Interior to plaintiffs, Menominee Enterprises, Inc., and First Wisconsin Trust Company, Trustees, in trust for the tribe. Certainly the Menominees constitute a "tribe, band, or other identifiable group of American Indians" within the meaning of the Indian Claims Commission Act of 1946, as amended, 28 U.S.C. § 1505 (1964), and they are asserting a claim in this case arising under the Treaty of 1854, infra, and the Termination Act, supra. Consequently, this court has jurisdiction of this case under the Indian Claims Commission Act, supra, and under the Tucker Act, 28 U.S.C. § 1491 (1964).

## I

The Menominee Indians have lived as a tribe since time immemorial in Wisconsin. They have made various treaties with the United States through the years, most of which have nothing to do with the present lawsuit. However, by way of background, we will point out that by the Treaty of St. Louis, 7 Stat. 153 (1817), they acknowledge themselves to be under the protection of the United States. The Treaties of Prairie des Chiens, 7 Stat. 272 (1825), and Butte des Morts, 7 Stat. 303 (1827), settled certain boundary questions, while by the Treaty of Washington, 7 Stat. 342 (1831), and 7 Stat. 405 (1832), they ceded 3 million acres to our Government. They ceded about 4,184,000 acres to the United States by the Treaty of Cedar Point, 7 Stat. 506 (1836), and in 1848, ceded the balance of their land of approximately 4 million acres by the Treaty of Lake Pow-aw-hay-kon-nay, 9 Stat. 952, in exchange for about 600,000 acres west of the Mississippi River.

As a part of this last treaty and exchange, it was agreed that they could inspect the land west of the Mississippi before moving on it. They did so and reported dissatisfaction with it and refused to move to it. The Government then ceded them 276,480 acres of different land on Wolf River in Wisconsin which was acceptable to them and to which they moved in 1852.

In order to legalize this exchange of land, the Treaty of 1848 was amended by the Treaty of Wolf River, 10 Stat. 1064, 1065 (1854), by which the Menominees ceded back to the Government the lands west of the Mississippi which they had refused to accept and in return the Government gave to them the reservation on Wolf River "for a home, to be held as Indian lands are held, * * *." No mention was made in this treaty or in the Treaty of 1848 about hunting or fishing rights.

Except for two small tracts ceded by the Menominees in 1856, for use by the New York Indians, 11 Stat. 679, the Wolf River Reservation of about 230,000 acres has remained intact as the Menominee Reservation to the present time. It was occupied and governed by them according to the customs, laws, rules and regulations of the tribe without any outside interference by the state or anyone else during the 100 years from 1854 to 1954. This freedom from outside regulation and interference during this period extended to and included their hunting and fishing on the reservation, which was controlled only by the rules and regulations of the tribe itself.

## II

We will consider first whether or not the Menominees had exclusive and unregulated hunting and fishing rights on their Wolf River Reservation. While it may be that the Menominees could establish a claim to such hunting and fishing rights by Indian title acquired by their ancestors through use and occupancy of land in Wisconsin for a long time, which may have included the land in their present reservation, these facts are not before us and we cannot speculate with reference to them. Actually, it is not necessary for us to pass upon any aboriginal claim to hunting and fishing rights, because the Menominees do not contend that their rights in this case are

based on aboriginal title at all. Rather, they pitch their claim squarely on the hunting and fishing rights which they assert were given to them by the Government in the Treaty of Wolf River in 1854, supra.

That treaty, which created their present reservation, did not specifically or expressly mention hunting and fishing rights. Article 2 of the treaty (10 Stat. 1065) provided:

> In consideration of the foregoing cession the United States agree to give, and do hereby give, to said Indians for a home, to be held as Indian lands are held, [the land in question] * *.

The Menominees say that the language "to be held as Indians lands are held" grants them an unqualified right to hunt and fish on the reservation in their own way free from all outside regulation or control. We think they are right. Cf. Oneida Tribe v. United States, 165 Ct. Cl. 487, 490–491 (1964), cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544. Moore v. United States, 157 F.2d 760 (9th Cir. 1946), cert. denied, 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277. The primary reason they accepted this reservation as their new home was that it was filled with all kinds of game. We so held in the case of Menominee Tribe of Indians v. United States, 95 Ct.Cl. 232, 240–241 (1941), where we said:

> The basis, the background, the previous history, and the negotiations leading up to the [1854] treaty show that the Indians were desirous of securing hunting lands and that the swamp lands were particularly suited for this purpose, being filled with all kinds of game. * * *
>
> * * * part of the inducement for the moving of the Indians from their former home to their new home, and one of the reasons for entering into the new treaty was the fact that the tract in question contained swamp lands which were suitable for hunting.

It should be remembered that at the time of the treaty in 1854, hunting and fishing was a way of life with the Menominees. They depended on it for their livelihood if not their very existence. It is inconceivable that a reservation would have been created for them at that time without giving them the exclusive right to hunt and fish. The Supreme Court in discussing fishing rights of Indians in the case of United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905), stated that such rights are "not much less necessary to the existence of the Indians than the atmosphere they breathed." The same observation applies to their hunting rights. See Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918).

The Supreme Court of Wisconsin in passing on the identical question before us in Wisconsin v. Sanapaw, 21 Wis.2d 377, 124 N.W.2d 41, 44 (1963), cert. denied, 377 U.S. 991, 84 S.Ct. 1911, 12 L.Ed. 2d 1044 (1964), rehearing denied, 379 U.S. 871, 85 S.Ct. 17, 13 L.Ed.2d 78, said that if the 1854 treaty provision which ceded these lands to the Menominees "to be held as Indians lands are held" was ambiguous as to whether or not it included hunting and fishing rights, it should be interpreted in favor of the Indians, citing Winters v. United States, 207 U.S. 564, 576–577, 28 S.Ct. 207, 52 L.Ed. 340 (1908). The court went on to say in the *Sanapaw* case:

> * * * Construing this ambiguous provision of the 1854 treaty favorably to the Menominees, we determine that they enjoyed the same exclusive hunting rights free from the restrictions of the state's game laws over the ceded lands, which comprised the Menominee Indian Reservation, as they had enjoyed over the lands ceded to the United States by the 1848 treaty. Ibid.

We agree with the Supreme Court of Wisconsin that the 1854 treaty did grant exclusive hunting and fishing rights to the Menominees on their reservation free from the state's game laws. Furthermore, they enjoyed these exclusive rights for 100 years with the consent and acquiescence of the State of Wisconsin. We are supported in our decision by the cases of Klamath & Modoc Tribes v.

Maison, 139 F.Supp. 634 (D.Or.1956), Klamath & Modoc Tribes v. Maison, (unreported, United States District Court for the District of Oregon, No. 8081 (1963)), and Oregon v. Pearson (unreported, District Court of Klamath County, Oregon, No. 61–792c (1961)). In those cases the treaty between the Government and the Klamath and Modoc Tribes and the Yahooskin Band of Snakes in 1864, did not mention hunting or trapping rights on their reservation, but the courts held that the treaty granted them such rights by implication and that the Indians could hunt and trap on their reservation without restriction or control by the State of Oregon.

### III

We come now to the consideration of whether or not the Menominee Termination Act of 1954, supra, abrogated or cancelled the hunting and fishing rights of the Menominees on their reservation and thereby subjected them to the game laws of the State of Wisconsin on the same basis as if they were non-Indian citizens of the state. The Act did not mention hunting and fishing rights, but the Menominees point out that the Supreme Court of Wisconsin held in the case of Wisconsin v. Sanapaw, supra, that the following language in the Act cut off their unregulated hunting and fishing rights and made them subject to the game laws of Wisconsin:

> Sec. 10. * * * all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and *the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.* [Emphasis supplied.] 68 Stat. 252, 25 U.S.C. § 899 (1964).

■ Since there was no mention of hunting and fishing rights in the Act either by way of preservation or abrogation, we must look to the legislative history of the Act and to all of the facts and circumstances existing at the time of its passage, as well as at the time it was implemented and became effective, to determine if it cut off these rights by implication. Offutt Housing Co. v. Sarpy County, 351 U.S. 253, 260, 76 S.Ct. 814, 100 L.Ed. 1151 (1956).

■■ The right to hunt and fish Indian fashion is a valuable property right. See United States v. Winans, supra; Tlingit and Haida Indians of Alaska v. United States, 147 Ct.Cl. 315, 177 F.Supp. 452 (1959). It should not be taken away by implication unless there is some cogent or compelling reason for doing so. This is in accord with the settled rule that repeals by implication are not favored and will not hold to have taken place if there is a reasonable construction, by which both the treaty and the statute can coexist consistently with the intention of Congress. Ward v. Race Horse, 163 U.S. 504, 511, 16 S.Ct. 1076, 41 L.Ed. 244 (1896); United States v. Zacks, 375 U.S. 59, 67, 84 S.Ct. 178, 11 L.Ed.2d 128 (1963). See United States v. Moore, 62 F.Supp. 660, 667 (W.D.Wash.1945), aff'd 157 F.2d 760 (9th Cir. 1946), cert. denied, 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277 (1947).

■ Turning to the legislative history, we find that the bill which was finally passed as the Termination Act, originated in the House of Representatives of the 83d Congress as H.R. 2828, U. S. Code Congressional and Administrative News, p. 305. There were two other bills, S. 2813 and H.R. 7135, on the same subject pending before the Congress at the same time. Both S. 2813 and H.R. 7135 provided for the preservation of the hunting and fishing rights the Menominees might have by treaty, statute, custom or judicial decision. H.R. 2828 was silent on the subject. At the hearings on the bills, two witnesses expressed their opinion that H.R. 2828 would not affect hunting and fishing rights acquired by *treaty* but would repeal such rights granted by *statute.* A third witness stated that he thought the bill by its silence would by implication abolish the tribal rights to exclusive hunting and

fishing within the reservation.[1] The Congress enacted H.R. 2828 into law without any provision as to hunting and fishing rights. It is argued that Congress thus made a choice and cut off the exclusive hunting and fishing rights by implication. We do not agree.

There was no need for the Congress to provide for the preservation of the hunting and fishing rights in the Termination Act for at least two reasons. In the first place, they were preserved and protected for the Menominees by another bill that was passed by the same 83d Congress and considered by the same committees of both houses. It was passed as an amendment to Public Law 280, 18 U.S.C. § 1162 (1964), on August 24, 1954, only about two months after the Termination Act was passed on June 17, 1954, but over six years before the Termination Act became effective on April 30, 1961. Public Law 280 dealt with the extension of criminal jurisdiction of the State of Wisconsin over the Menominee Reservation and expressly reserved and protected the hunting and fishing rights of the Menominees in the following language:

> § 1162. State jurisdiction over offenses committed by or against Indians in the Indian country.
>
> (a) Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

| State or Territory of | Indian country affected |
|---|---|
| * * * | * * * |
| Wisconsin | All Indian country within the State. |

> (b) *Nothing in this section,* shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or *shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.* [Emphasis supplied.]

> * * * * * *

It is logical to assume that the Congress, acting through its committees that handled both bills, as well as by its own action as a whole, knew that hunting and fishing rights were being protected in Public Law 280 and there was no need to mention them in the Termination Act.[2]

Also, it should be pointed out that H.R. 7135 and S. 2813, which were the other two bills considered by Congress when H.R. 2828 (The Termination Act) was also considered, contained language practically identical to the language in Public Law 280 with reference to hunting and

---

1. Joint Hearings Before the Subcommittees of the Committees on Interior and Insular Affairs on S. 2813, H.R. 2828, and H.R. 7135, 83d Cong., 2d Sess., pt. 6, at 588, 629, 697 (1954).

2. It should be noted that the bill (H.R. 1063) which became Public Law 280 was introduced on January 6, 1953, and was passed on August 15, 1953. On February 9, 1953, approximately one month after the introduction of H.R. 1063, the bill (H.R. 2828) which was to ultimately become the Menominee Termination Act was introduced. It was passed on June 17, 1954. The Menominee Reservation was added to those lands subject to Public Law 280 pursuant to the amendment of August 24, 1954.

fishing rights. For instance, they both provided:

> Sec. 15. Nothing contained in this Act shall deprive the tribe or its members of any rights, privileges, or immunity afforded by treaty, statute, custom, or judicial decision, to fish, hunt, trap, and harvest the products of nature or the control, licensing, or regulation thereof, except as may be agreed upon from time to time by the tribe and the State of Wisconsin; * *. Joint Hearings Before the Subcommittees of the Committees on Interior and Insular Affairs on S. 2813, H.R. 2828, and H.R. 7135, 83d Cong., 2d Sess., pt. 6, at 581, 583 (1954).

Obviously, there was no need to protect the hunting and fishing rights in both the Termination Act and in Public Law 280 with almost the same phraseology. So, H.R. 2828 (The Termination Act) was passed without mention of such rights. But they were preserved in the Menominee Amendment to Public Law 280, which became law in 1954, almost seven years before the Termination Act became effective in 1961.

In the second place, it was unnecessary to preserve the hunting and fishing rights in the Termination Act because by the terms of the Act it was provided that the tribe would submit a plan to the Secretary of the Interior which:

> Sec. 7. * * * shall contain provision for protection of the forest on a sustained yield basis and for the protection of the water, soil, fish and wildlife. 70 Stat. 549, 25 U.S.C. § 896 (1964).

The Act provided further that upon the submission of such a plan by the tribe and its approval by the Secretary of the Interior, he would issue a proclamation containing the plan and his approval thereof. The Termination Act would become effective upon the issuance and publication of the proclamation.

In due time, the tribe did submit such a plan to the Secretary of the Interior.

It included a provision on law and order (which would include hunting and fishing) in the following language:

> It is unnecessary, aside from amendment of Wisconsin laws to accord with existing judicial machinery, to provide specific plans for future handling of law and order, federal jurisdiction over the Menominee Reservation having been surrendered by the United States by Public Law 280, 83d Congress, as amended (18 U.S.C. 1162).[3]

By this language, the tribe referred to Public Law 280 and in effect made it a part of its plan by reference, thereby protecting and preserving its hunting and fishing rights in great detail. It is pertinent to observe at this point that the amendment to Public Law 280, which was to incorporate the Menominee Reservation within its provisions, was introduced at the request of the Menominee Indians. At the time Public Law 280 was enacted, the tribe had requested exemption becaues they felt their tribal law was sufficient. The tribe thereafter reconsidered its position and authorized its attorneys and its tribal delegates to seek the amendment referred to in April 1954, prior to passage of the Termination Act. The amendment was to "carry out the wishes of the tribe." S.REP. No. 2223, United States Code Congressional and Administrative News, 83d Cong., 2d Sess. pp. 3171–72 (1954).

■ Certainly the Menominee Tribe did not feel that the Termination Act divested them of their unrestricted right to hunt and fish. Furthermore, in seeking the amendment which would extend the criminal jurisdiction of Wisconsin over the Menominee Reservation, excluding the regulation of hunting and fishing rights granted by treaty, it cannot be said that a sacrifice of these rights was at all contemplated. The plan was approved and the Proclamation was issued by the Secretary of the Interior, thereby making the Termination Act effective on the 30th day of April 1961. By this procedure, the provisions of Public Law 280

3. 26 Fed.Reg. 3726, 3728 (1961).

that preserved the hunting and fishing rights of the Menominees were included in and made a part of the Termination Act of 1954 by reference. This leads us to the inescapable conclusion that the Termination Act not only did not abrogate the exclusive hunting and fishing rights of the Menominees on their own reservation, but actually preserved and protected them. Further supporting this view is the observation that a plan calling for the protection of fish and wildlife would hardly be necessary if state laws were to govern in those areas. See S. REP. No. 2412, 84th Cong., 2d Sess. 2 (1956), in which it is indicated that the Menominees would have no trouble formulating such a plan.

## IV

We are mindful that this conclusion is different from the result reached by the majority of the Supreme Court of Wisconsin on the same question in the case of Wisconsin v. Sanapaw, supra, but it is in accord with the result of the dissenting opinion. In that case three Menominee Indians were charged in criminal complaints in the same case with hunting deer with the aid of an artificial light and with the transportation of a loaded and uncased gun in an automobile on the Menominee Reservation in violation of the game laws of the State of Wisconsin. The defendants pleaded not guilty but admitted, and the court found, that the alleged violations were, in fact, committed. The trial court, however, in an unreported written opinion found the defendants not guilt because they were enrolled members of the Menominee Indian tribe and the state had no jurisdiction to enforce its hunting and fishing regulations against them on the Menominee Reservation. It based its decision on the fact that the Treaty of 1854 granted the Menominee Indians the right to hunt and fish on their reservation free from regulation of the state game laws and that this right had been enjoyed by the Indians for over 100 years and that the Termination Act, supra, did not terminate such exclusive hunting and fishing rights. The state appealed the case to the Supreme Court of Wisconsin where the majority of the court reversed the decision of the trial court and held that the Menominee Termination Act abrogated the tribe's right to be free of the state's game laws in hunting and fishing on its reservation. The case was remanded to the trial court for further proceedings in accordance with the opinion. The court based its decision solely on its interpretation of the words and language of the Act itself. While we think an opposite interpretation of the Act should be made, still, out of deference and respect for the Wisconsin Supreme Court, we will say that if that court could have had the benefit of all the facts and circumstances surrounding the contemporaneous consideration of Public Law 280, by the same Congress that passed the Termination Act, including the plan of the tribe incorporating a portion of Public Law 280 therein, and its approval by the Secretary of the Interior, in effect making such provisions of Public Law 280 a part of the Termination Act, the decision of that court might well have been different.

Our view is supported by the two decisions in Klamath & Modoc Tribes v. Maison, supra, and the case of Oregon v. Pearson, supra. In those cases, which we will refer to as the *Klamath* cases, the tribes had exclusive fishing rights on their reservation which were granted to them by the Treaty of October 14, 1864, 16 Stat. 707, 708 in connection with the creation of their reservation. The treaty provided:

> * * * and the exclusive right of taking fish in the streams and lakes, included in said reservation, * * * is hereby secured to the Indians aforesaid: * * *.

Nothing was said in the treaty about hunting or trapping. On August 13, 1954, Congress passed the Klamath Termination Act, 68 Stat. 718, 25 U.S.C. §§ 564–564x (1964), which provided:

> Sec. 14. * * *
>
> (b) Nothing in this Act shall abrogate any fishing rights or privileges of the tribe or the members thereof

enjoyed under Federal treaty. Id. at 722.

Here again, nothing was said about hunting or trapping. However, it should be noted that this Termination Act contained the same general language as is contained in the Menominee Termination Act, which the Supreme Court of Wisconsin said in the *Sanapaw* case cut off the hunting and fishing right of the Menominees, as follows:

> Sec. 18. * * * all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and *the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.* [Emphasis supplied.] 68 Stat. 72, 25 U.S.C. § 564q (1964).

In the *Klamath* cases certain Indians were charged with illegally hunting and trapping wild game on their reservation contrary to the game laws of Oregon. This occurred after the Klamath Termination Act was passed. The same argument was made there (as here) that since there was no mention of hunting or trapping in either the treaty or the Termination Act, such rights, if they ever existed, were cut off by the Termination Act. It was argued that this was especially true since fishing rights were expressly preserved and that if Congress had intended to preserve hunting and trapping rights it would have said so in the Termination Act. But the courts in those cases disagreed with this argument and held that the Termination Act did not cut off the hunting and trapping rights of the tribe. They also held that such rights were specifically recognized by Congress in Public Law 280, and that the members of the tribe had a right to hunt and trap on the reservation without restrictions or control by the State of Oregon.

In the only reported case of the three referred to infra, the court concluded as follows:

> * * * * * *

2. Public Law 280, 83d Cong., 67 Stat. 588, 18 U.S.C. § 1162, * * * did not extend the hunting and trapping laws of the State of Oregon to the Klamath Indian Reservation. Klamath & Modoc Tribes v. Maison, supra, 139 F.Supp. at 637.

While the effect of Public Law 280 was specifically mentioned in Klamath & Modoc Tribes v. Maison, 139 F.Supp. 634 (D.Or.1956), no reference to the Klamath Termination Act was made. However, in the unreported Klamath case, dated December 10, 1963, the court retained jurisdiction over its previous decision rendered in 1956, and made reference to the Klamath Termination Act by stating that the remaining enrolled members of the tribe, pursuant to treaty, had the unrestricted right to hunt and trap upon their lands. It further expressed the view that withdrawn members of the tribe who continued to be members for purposes of tribal claims against the United States, pursuant to the Klamath Termination Act, had no such privileges. Thus, we have an implicit recognition that the remaining enrolled members of the tribe, subsequent to the effective date of the Klamath Termination Act, still retained their right to hunt and trap upon their lands without restriction or control by the state. Furthermore, in Oregon v. Pearson, supra, the court expressly held that since the Klamath Termination Act did not specifically grant away the hunting and trapping rights, they were retained by the enrolled members without restriction by the State of Oregon.

These conclusions were supported by the Department of the Interior, acting through Glenn F. Emmons, Commissioner of the Bureau of Indian Affairs, when the Commissioner issued a memorandum dated July 2, 1956, on the subject of "Policy of the Bureau respecting the protection and preservation of Indian hunting and fishing rights in termination legislation." This memorandum states:

> * * * * * *
>
> Following the policy laid down by the Congress in the enactment of the act of August 15, 1953 (67 Stat. 588;

Public Law 280, 83d Cong.), the Bureau's policy will be to protect and preserve any right, privilege or immunity with respect to hunting, trapping or fishing afforded to any Indian or Indian group by Federal treaty, agreement or statute in the planning and execution of readjustment programs, including the seeking of legislation necessary to carry out such programs.

Section 2 of the act of August 15, 1953, supra, states the policy of the Congress concerning the protection and preservation of Indian hunting and fishing rights. It provides that nothing in the act shall deprive any Indian or any Indian tribe, band or community of any right, privilege or immunity afforded under Federal treaty, agreement or statute with respect to hunting, trapping or fishing or the control, licensing or regulation thereof.

\* \* \* \* \* \*

The memorandum then mentioned the decision in Klamath & Modoc Tribes v. Maison, supra, with approval by stating that it would follow the interpretation of Public Law 280 as made by that case unless changed by other court decisions, saying:

It thus appears, from the only judicial interpretation of the act which has been made, that the intention of Congress was to preserve and protect both express and implied rights, privileges and immunities afforded under Federal treaties, agreements, or statutes with respects [sic] to hunting, trapping and fishing. This Bureau will accept the interpretation of the statute as made by the courts and lend such assistance as is possible in preserving and protecting hunting and fishing rights of the Indians.

\* \* \* \* \* \*

It thus appears that the Commissioner fully understood and agreed that Public Law 280 preserved and protected hunting and fishing rights of Indians who were the subject of Termination Acts, such as the Menominees.

The question before us seems to have been laid to rest by the Supreme Court in the case of Metlakatla Indian Community v. Egan, 369 U.S. 45, 82 S.Ct. 552, 7 L. Ed.2d 562 (1962). In that case, Congress authorized the Secretary of the Interior in 1891, to prescribe rules and regulations governing the Metlakatla Reservation in Alaska. Acting under this authority, the Secretary issued regulations in 1951, allowing the Metlakatlas to use fish traps in the waters around their reservation. After Alaska became a state, it passed an anti-fish-trap law in 1959, and sought to enforce it against the Metlakatlas as to the waters surrounding their reservation. Mr. Justice Frankfurter, in speaking for the Supreme Court decided the case adversely to the state on the basis of Public Law 280 by saying:

In 1958, 72 Stat. 545, Alaska was added to the list of States and Territories permitted to exercise civil and criminal jurisdiction over Indian reservations. The State has not argued that this took away the power of the Secretary of the Interior to make regulations contrary to state law. Appellant has argued, to the contrary, that the statute expressly preserved Indian fishing rights from state laws. The statute granting States civil and criminal jurisdiction was passed in 1953, 67 Stat. 588, 18 U.S.C. § 1162, 18 U.S.C.A. § 1162, 28 U.S.C. § 1360, 28 U.S.C.A. § 1360. Subsections (b) of 18 U.S.C. § 1162, 18 U.S.C.A. § 1162, provides that nothing therein shall authorize alienation, encumbrance, or taxation of Indian property, "or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof."

*This statute expressly protects against state invasion all uses of In-*

*dian property authorized by federal treaty, agreement, statute, or regulation, but only those fishing rights and privileges given by federal treaty, agreement, or statute.* [Emphasis supplied.] Id. at 56, 82 S.Ct. at 560.

Of course, fishing rights were emphasized in that case, but, obviously, if hunting or trapping rights had been involved, the same result would have been reached as to them, since they are all treated together in Public Law 280. The Supreme Court upheld the right of the Metlakatlas to use fish traps in the waters around their reservation free from any interference by the fish-trap laws of the State of Alaska, thereby extending the protection of Public Law 280 to "regulations", in addition to "treaty, agreement or statute," although regulations are not mentioned in the statute.

When applied to the case before us, the holding of the Supreme Court in the *Metlakatla* case as quoted above, "This statute [Public Law 280] expressly protects against state invasion all uses of Indian property authorized by federal treaty, agreement, statute, or regulation, * *," clearly recognizes and establishes the right of the Menominees to hunt and fish and trap on their reservation free from interference by the game laws of the State of Wisconsin.

### V

 If the rights of the Menominees to hunt and fish on their reservation free from regulation by the state's game laws have been interfered with, it is due to the action of the State of Wisconsin acting through its Supreme Court and law enforcement officers and not because of any act of the United States. Consequently, any complaint they have on that score should be against the State of Wisconsin and not against the Federal Government. In extending the jurisdiction of its game laws over the Menominee Reservation, Wisconsin was acting as a sovereign state wholly independent of any authority granted to it in this respect by the United States. In so doing, it was not an agent of the Federal Government and the

Government is neither responsible nor liable for its improper acts. Cf. D. R. Smalley & Sons v. United States, Ct.Cl., decided February 17, 1967, 372 F.2d 505.

It may be argued that the conflict between our holding in this case and the decision of the Supreme Court of Wisconsin in the *Sanapaw* case, supra, leaves the Menominee Indians in an impossible position. This does not necessarily follow. They have the same remedy, among others, that the Quillayute Tribe of Indians had in the case of United States v. Moore, 62 F.Supp. 660 (W.D.Wash.1945), aff'd, 157 F.2d 760 (9th Cir. 1946), cert. denied, 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277 (1947). There, an injunction suit was filed by the United States on behalf of the tribe to restrain state conservation officers, namely the Directors of Game and of Fisheries of the State of Washington, from enforcing the state's game laws on the Quillayute Indian Reservation. The trial court granted the injunction and decreed that the defendants were "permanently enjoined, restrained, and debarred from interfering in any manner with or asserting any jurisdiction or control whatsoever over fishing activities" of the tribal members on their reservation. Id. at 761.

On appeal the court held that in the creation of the reservation "sufficient for their [the Indians] wants" the United States preserved the area in controversy for the exclusive use of the Indians and it was not subject to the fish and game laws of the state. Id. at 763–764.

### VI

In summary, we hold: (1) the Treaty of Wolf River in 1854 granted exclusive hunting and fishing rights to the Menominees on their reservation free from outside regulation; (2) the Menominee Termination Act of 1954 did not abrogate or cut off such hunting and fishing rights, and even though the Supreme Court of Wisconsin erroneously, in our opinion, construed the Act to terminate such rights, this does not create liability against the United States; (3) the Menominees, therefore, who are enrolled as members of the tribe on its records in ac-

cordance with the Termination Act, have, own and possess at the present time the exclusive right to hunt and fish on their reservation free from restriction, regulation, or control by the State of Wisconsin; and (4) the petition of the Menominees, having failed to state a cause of action against the United States, is hereby dismissed.

Accordingly, defendant's motion for summary judgment is granted and plaintiffs' petition is dismissed.

DURFEE, Judge (dissenting):

In Wisconsin v. Sanapaw et al., 21 Wis. 2d 377, 124 N.W.2d 41 (1963), cert. denied, 377 U.S. 991, 84 S.Ct. 1911, 12 L. Ed.2d 1044 (1964), rehearing denied 379 U.S. 871, 85 S.Ct. 17, 13 L.Ed.2d 78 (1964), the Wisconsin Supreme Court held that Congress by its enactment of Section 10 of the Menominee Termination Act of 1954 ended plaintiff's unregulated hunting and fishing and brought them within the purview of the state's game laws. See 68 Stat. 250, 25 U.S.C. § 899 (1964). The state court found that the state's asserted regulation of the Indians was derivative of Federal statutes and that the Indians had no claim against the state. The majority of our court now decides the reverse; that is, that the Termination Act "did not abrogate the exclusive hunting and fishing rights of the Menominees on their own reservation, but actually preserved and protected them." The court means that any future complaint by the Indians for violation of their hunting and fishing rights is against the State of Wisconsin and not the Federal government. Each court has told the Indians that they have rights, but not in the deciding court. Thus, the Indians have won both contests, but each time on the wrong playing field and against the wrong opposition.

This court's decision leaves plaintiffs in a state of legal weightlessness. While each court has held that the other court's government is responsible for plaintiffs' condition, neither is able to enforce its finding. The Wisconsin Supreme Court cannot make the Federal government compensate the Indians. And this court is unable to stop Wisconsin's enforcement of state game laws, even though we say the Indians are not subject thereto. Thus, if there is no appeal of this court's decision, plaintiffs may never have their dilemma effectively resolved. Their situation will not be the common one of the party who finds himself with conflicting decisions in several Federal circuit courts. Rather it will be akin to the situation of Alphonse and Gaston where two courts tell each other that any further resolution of the dilemma belongs to the other's docket. The result is that neither court takes further action, and the Menominee Indian who tries to exercise his ancient hunting and fishing rights on his own reservation winds up in jail.

The predicament of plaintiffs does not have to remain insolvable. The majority opinion presents one solution. It recommends that plaintiffs seek, in a Federal district court, an injunction against the State of Wisconsin preventing it from inforcing its game laws. This suggestion is fraught with drawbacks; the most minor one being the possibility that the injunction will not be granted. Of major consequence are the difficulties connected with Federal action against state officials in the functioning of their duties. It suffices to say that the problems arising out of Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) and its progeny make me very chary of Federal injunctions issued against state functions. See, generally, Hart & Wechsler, The Federal Courts and the Federal System 814–890; Developments in the Law —Injunctions 78 Harv.L.Rev. 994, 1045 (1965); Wright, Federal Courts, 348. Cf. Martin v. Creasy, 360 U.S. 219, 79 S. Ct. 1034, 3 L.Ed.2d 1186 (1959).[1]

1. The problems in this area were passed over without comment by the court in United States v. Moore, 62 F.Supp. 660 (W.D.Wash.1945); aff'd 157 F.2d 760 (9 Cir. 1946); cert. denied, 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277 (1947), the case cited by the majority to support the suggestion of an injunction. In that case,

A more obvious solution to plaintiffs' difficulties would be a grant of certiorari by the Supreme Court and a resolution of the conflict between the state and Federal courts' decisions. However, the United States Supreme Court has already denied certiorari in the Wisconsin Supreme Court Indian case, and in the *Klamath Indian* case cited by the majority herein to the same effect as our present opinion.

In situations like this, at least two other approaches—comity and certification—are available to assist in resolving the Indians' predicament. These legal vehicles contain a greater degree of certainty than either certiorari or injunction. For, with them, the resolution of the conflict between the courts is not left to a later court's acts, but is handled while the case is still within this court's jurisdiction. Even though the conflict between the courts would be resolved in this court, neither of the two additional approaches require as thorough handling of the merits of the case as the majority does. Thus by doing less in the handling of the case, this court could do more to resolve plaintiffs' situation.

The first of these approaches—comity—would mean the acceptance by this court of the decision of the Wisconsin Supreme Court. Acceptance of the state court's decision does not mean that the process is automatic, that there is no inspection of either the present case or the state's decision. That approach would relegate the court to being a mere rubber stamp or a judicial conduit. Not only would that possibly saddle the court with an unsound decision, but also it would mean an abdication of duty. In this case, the thought of comity should not arise until one believes that he is not without doubt on the question of whether or not the Menominee Termination Act cancelled hunting and fishing rights of the Indians. The next step is to inspect the state court decision to see if it is reasonably derived. With a positive answer to this inspection, one would use comity and

leave the final resolution to a higher court. Mast, Foos & Company v. Stover Manufacturing Company, 177 U.S. 485, 488–489, 20 S.Ct. 708, 44 L.Ed. 856 (1900); Sanitary Refrigerator Company v. Winters, et al., 280 U.S. 30, 35, 50 S.Ct. 9, 74 L.Ed. 147 (1929).

The second approach available to courts whose resolution of an issue is not fixed is the seldom used process of certification. Moore & Vestal, Present and Potential Role of Certification in Federal Appellate Procedure, 35 Va.L.Rev. 1, 46–50 (1949). 28 U.S.C. § 1255(2) provides that "[c]ases in the Court of Claims may be reveiwed by the Supreme Court * * [b]y certification of any question of law by the Court of Claims in any case as to which instructions are desired, and upon such certification the Supreme Court may give binding instructions on such question." The sporadic use of certification is not due to its lack of success. For, when used, it has been beneficially employed. See Williams v. United States, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933) and O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933) (both certifications from the Court of Claims). Use of certification in this case should not augment the fears held by many that an extensive use of this right could unduly enlarge the Supreme Court's obligatory jurisdiction. This is not the case where a court is trying to conceal an obligatory appeal in another guise. There is no wolf in sheep's clothing. Certification is put forth so that this court could make every possible effort to arrive at a sound adjudication of a case that presents a troubling issue of law augmented by the possibility of a never-solved conflict between Federal and state courts that would deprive plaintiffs of a final, meaningful resolution of their suit. The Menominees are either entitled to their hunting and fishing rights under the Treaty or they are entitled to damages because these rights have been taken away, and certification would guarantee

plaintiff requested an injnction. After holding for plaintiff on the law, the court

decided that it should grant plaintiff's request.

one of these decisions and not a meaningless hybrid.

Between comity and certification, I favor the latter approach because it seeks guidance from a higher court rather than looks backwards to a lower court as comity does. Therefore, rather than reach a decision on the merits of the case at this time, I would have certified the following question to the Supreme Court Court: Did the Menominee Termination Act of 1954 cancel the hunting and fishing rights of plaintiffs on their reservation and thereby subject them to the game laws of the State of Wisconsin as if they were non-Indian citizens of the state?

The history of the Menominee Tribe does not read well for the conduct of the United States. Again and again the Tribe has had to sue the Federal government in this court to recover damages to which they were entitled. Recently, a committee of the Congress referred to this court as "the keeper of the nation's conscience." If the court is to continue to deserve this title, we must now see to it that before the Federal government finally closes its books on the old Menominee Tribe, the last page is written with honest justice for them and for their rights.

LARAMORE and COLLINS, Judges, join in the foregoing dissent.